UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JEFFREY K.,[1]

                                    Plaintiff                    DECISION and ORDER

-vs-                                                             6:24-CV-06042-CJS

COMMISSIONER OF SOCIAL
SECURITY,

                                    Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant")

which denied the application of Plaintiff for Social Security Disability Insurance ("DIB")

benefits.   Plaintiff maintains that such determination must be reversed since the

Commissioner's decision contains errors of law and is unsupported by substantial

evidence, as more specifically set forth below.   Now before the Court is Plaintiff's motion

for judgment on the pleadings (ECF No. 6) and Defendant's cross-motion for the same

relief (ECF No. 15).   For reasons discussed below, Plaintiff's application is denied,

Defendant's application is granted, and the action is dismissed.

_____

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in
the United States District Court for the Western District of New York, any non-government party will be
identified and referenced solely by first name and last initial."

STANDARDS OF LAW

The Commissioner decides applications for disability benefits using a five-step sequential evaluation process:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment[2] which significantly limits his physical or mental ability to do basic work activities.[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity [("RFC")] to perform his past work.[4] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.[5]

---

[2] "At step two, the ALJ must determine whether the claimant has a 'severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 404.1509, or a combination of impairments that is severe and meets the duration requirement.' *Id.* If not, the claimant is deemed not disabled, and the inquiry ends." *Koch v. Colvin*, 570 F. App'x 99, 101 (2d Cir. 2014); *see also*, 20 C.F.R. § 404.1520(a)(4)(ii) ("At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.").

[3] The Commissioner's Regulations define basic work-related activities as follows: "Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include— (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting."   20 C.F.R. § 404.1522 (West 2023).

[4] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

[5] "The Commissioner's burden at step five is to show the existence of possible employment for an individual with the RFC determined by the ALJ in the fourth step of the sequential analysis." *Smith v. Berryhill*, 740 F. App'x 721, 726–27 (2d Cir. 2018) (citation omitted). The ALJ typically does this either by resorting to the medical vocational "grids" or, where the claimant has a non-exertional impairment, by taking testimony from a vocational expert [("VE")]. *See, Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986)

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted).

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim. In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).

The issue to be determined by the court in such an action is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court

---

("[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.").

cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [administrative law judge] [("]ALJ[)"]. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773; *see also*, 42 U.S.C.A. § 405(g) ("The findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive.").   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Tejada v. Apfel*, 167 F.3d at 773 (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted); *see also, Snyder v. Comm'r of Soc. Sec*., No. 22-277-CV, 2023 WL 1943108, at *1 (2d Cir. Feb. 13, 2023) ("While the substantial evidence standard requires we find more than a mere scintilla of support for the Commissioner's decision, it is still a very deferential standard of review requiring us to uphold the Commissioner's findings unless a reasonable factfinder would *have to conclude*

*otherwise.*") (emphasis in original; citations and internal quotation marks omitted); *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022) ("We may vacate the agency's disability determination only if it is based on legal error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have reached the same conclusion as the ALJ.").

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted). "In other words, this Court must afford the Commissioner's determination considerable deference, and 'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'" *Melia v. Colvin*, No. 1:14-CV-00226 MAD, 2015 WL 4041742, at *2 (N.D.N.Y. July 1, 2015) (quoting *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir.1984)).

When considering whether a particular finding or decision is supported by substantial evidence, a court also may not rely on any *post hoc* rationalizations offered

by the Commissioner, but it may consider evidence that was evidently considered by the Administrative Law Judge ("ALJ") even if it was not expressly mentioned in the administrative decision. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability. *E.g., Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir.1982). In *Berry*, we noted that, although we would remand for further findings or a clearer explanation where we could not fathom the ALJ's rationale "in relation to evidence in the record," we would not remand where "we were able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Id*.[; [s]*ee also Miles v. Harris*, 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between the reports of [two doctors], we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony ...."))."); *see also*, *Loni S. v. Comm'r of Soc. Sec.*, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *19 (N.D.N.Y. June 27, 2023) ("The Court is required to look at the entire ALJ's decision when reviewing for substantial evidence. *See John L. M. v. Kijakazi*, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (citations omitted) ('[W]hile a reviewing court may not affirm the Commissioner's decision based on an impermissible *post-hoc* rationalization, it may affirm where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.').").

6

FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the factual and procedural history of this action, which is set forth in the parties' papers.   The Court will therefore refer to the record only as necessary to rule on the alleged errors identified by Plaintiff, which involve the ALJ's consideration of medical opinion evidence and other evidence when making his RFC finding. ECF No. 6-1 at p. 1.

On September 14, 2023, the ALJ issued a Decision finding that Plaintiff was not disabled at any time during the period of alleged disability. Tr. 709-721.   The ALJ found, in pertinent part, regarding the first three steps of the sequential evaluation, that Plaintiff had engaged in SGA since the alleged disability onset date, during the first and third quarters of 2022, but that "in the interests of administrative efficiency, [the ALJ] would proceed through the remainder of the sequential evaluation";[6] that Plaintiff had severe impairments consisting of "lumbar spine impairment with status-post fusion; status post repair of bilateral inguinal hernia; and obesity"; that Plaintiff had non-severe impairments consisting of glaucoma, cataracts, depressive disorder and opioid dependence in remission; and that Plaintiff's impairments, either singly or in combination, did not meet or medically equal a listed impairment. Tr. 712-715.

Prior to reaching step four of the sequential evaluation, the ALJ found that Plaintiff had the RFC to perform a less-than-full range of light work:

[C]laimant has the residual functional capacity to perform light work as

---

[6] *See*, Commissioner's Memo of Law, ECF No. 15-1 at p. 4 ("The ALJ found at step one that Plaintiff had engaged in substantial gainful activity during the first and third quarters of 2022. Tr. 712. However, the ALJ noted, because there had been a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity, the ALJ considered Plaintiff's claim during the entire period at issue. *Id.*").

defined in 20 CFR 404.1567(b) except occasional push/pull bilaterally; occasional climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; no balancing; occasional stooping, kneeling, crouching, and crawling; avoid concentrated exposure to vibrations; no hazards such as unprotected heights and dangerous machinery; occasional operation of a motor vehicle; and occasional exposure to atmospheric conditions as defined by the Selected Characteristics of Occupations (SCO).

Tr. 715.

The ALJ offered a detailed explanation for this RFC finding, stating, in pertinent part, as follows:

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p. The undersigned also considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c.
*** 
After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

At the hearing, the claimant alleged the following: he has been living at his current address for about one year. He lives in a two-level house with his parents. He sees his 10-year-old [child], who is a 10-minute drive away, 1-2 times per week. He is 5'6" and weighs 165 pounds. He drives around once a week to work. He last worked [full-time] on September 4, 2019[,] doing security work. He did that on and off for many years before he was terminated in September 2019. He was terminated because he did not follow company rules for callouts. [After being terminated,] [h]e did not look for [other] work right away because of his back [pain]. He [had undergone] back surgery a few months before his termination. [After such surgery,] [h]e was out 4-5 months until he returned to work. When he returned to work, he

8

went back twice a week for about 1-2 weeks until he was back full-time. [After being terminated from his job as a security guard in September 2019,] [h]e started working again in June 2022 at a restaurant/brewery checking IDs. He works part-time (24 hours per week, 4-5 days per week, for $17.17 an hour). [He states that when he is not working, l]aying down is the only position that feels good. He lies down in bed 3-5 times per day for a couple of hours. He also gets fatigued fast.

The objective medical record supports that the claimant's physical impairments result in some degree of functional limitation, but not to the extent alleged. At the end of 2018, the claimant presented with complaints of low back and left buttock pain. The pain start[ed] in the morning and g[ot] worse throughout the day. Sitting relieve[d] the pain and 800 mg ibuprofen g[ave] him mild to moderate relief. However, he also stated that aggravating factors at his work include[d] walking and sitting (Ex. 5F at 40). The claimant was eventually diagnosed with severe bilateral facet arthropathy at L4-5 with moderate to severe left foraminal stenosis. This impairment resulted in a December 14, 2018 elective L4-5 lateral lumbar interbody fusion and posterior minimally invasive screw rod instrumentation placement. Post-surgical follow-up records reflect resolution of the claimant's leg pain as well as improved left thigh numbness and buttock pain (Ex. 6F at 5- 6). By March 2019, the claimant reported his buttock pain resolved, ambulation improved, and [he had only] low back pain when bending (Ex. 5F at 8).

In November 2019, the claimant presented at his primary care provider with disability forms. He endorsed worsening back problems with radiation into his left buttock and thigh. [He stated that e]ven bending his head down while standing cause[d] severe pain/burning. No abnormalities were noted on examination (Ex. 4F at 7).

In the beginning of 2020, the claimant reported back pain rated 4-5/10. He denied any leg or foot pain as well as no burning pain (Ex. 5F at 4). Imaging from that month revealed the claimant's hardware [was] in good position, only mild arthritic changes, and stable "slight" L4-5 spondylolistheses. Moderate arthritic change was noted at the T11-12 level (Exs. 8F at 10; 19F at 8).

Physical exams by providers in 2020 note[d] only some slightly reduced

range of motion of the lumbar spine with flexion and extension as well as tenderness around the scars at the surgical site (Exs. 5F at 6; 19F/8). Examinations more frequently noted the claimant as being in no acute distress with a normal gait and ambulation, normal strength, and unremarkable findings on range of motion testing (Exs. 6F at 22; 19F at 8; 17F at 4). Additionally, a pain management treatment note in September 2019 assessed that "most of his pain seems superficial" around the two vertical scars in the L4-5 region (Ex. 19F at 12).

Treatment for the claimant's back impairment was conservative in 2020. The record notes he was treated with Flexeril and Motrin. He was provided a back brace and [a] bone stimulator was ordered, but there is no evidence of its use or efficacy. He was also treated with a trigger point injection in October 2020 (Exs. 18F at 20; 19F at 25, 28).

The claimant underwent a physical consultative exam performed by Harbinder Toor, M.D. [("Toor")], on March 17, 2020. The claimant reported that he experienced worsening pain rated as high as 10/10, as well as radiating pain and numbness and tingling in the left leg. However, this is not consistent with his report the day prior during a follow-up visit for his back in which he described the pain in his back as 4-5/10 and denied any leg pain or foot pain and no burning pain. The claimant also reported restrictions in his activities of daily living and activities around the house such as meal preparation and household chores (Exs. 18F at 18; 10F). On examination, the claimant was noted to have some decrease in sensation to touch and pinprick in the left leg as well as positive straight leg raising bilaterally both seated and supine. He had normal range of motion except at the lumbar spine. However, he retained normal strength and deep tendon reflexes in the upper and lower extremities; had no muscle atrophy; and had no deficits in hand and finger dexterity or grip strength. He was observed with a normal gait and stance without assistive device use and was able to walk on his heels and toes, squat to 50%, and rise from a chair without difficulty (Ex. 10F).

A mental consultative exam performed by Stephen Farmer, Psy.D. [("Farmer")] also performed on March 17, 2020 did not reflect any observed physical limitations. The claimant drove himself to the hearing and . . . had normal posture with good grooming and hygiene. Further, the claimant

reported a greater level of functioning than [he had] reported the same day to Dr. Toor. He stated that he [was] able to prepare meals, do general cleaning, laundry, drive, and take public transportation (Ex.11F).

Records from 2021 and 2022 reflect very limited treatment. In January 2021, the claimant reported pain very focal around two incisions in his back. Otherwise, [he stated that] his surgery took away a lot of the "burning" pain in his low back, but [that he had] chronic numbness in his left leg. An examination revealed tenderness to palpation to lumbar paravertebral muscles. Again, it was noted that most of his pain seem[ed] "superficial" around his vertical lumbar scars. It was decided that he undergo another trigger point injection since after his October 2020 injection, he was able to stand and walk for longer periods. He underwent such injection in March 2021 (Ex. 21F at 1).

***

Turning to the opinion evidence, the medical consultants at the state level opined that the claimant is limited to light work and can only perform postural activities occasionally except frequently balance and kneel (Exs. 1A, 4A). These opinions are generally supported and consistent with the record discussed above, which demonstrates that the claimant is limited to a reduced range of light work including with respect to postural activities. As such, the undersigned finds these opinions generally persuasive through the date of their review, to the extent that they correspond to the findings in this decision.

After the claimant's [spinal] surgery [in 2018], Faith Childers, P.A. [("Childers")], opined in February 2019 that he should continue to avoid pushing, lifting, and pulling more than 15 pounds; and no bending and twisting the spine. The following month, [Plaintiff's spinal surgeon,] Michael Li Yan, M.D. [("Yan")], opined that the claimant should continue to avoid strenuous activity; no pushing, lifting, and pulling more than 10 pounds; and no bending and twisting the spine (Ex. 5F at 10-11). Also prior to the alleged onset date and prior to surgery, Dr. Yan opined in October 2018 that the claimant should continue to avoid strenuous activity; no pushing, lifting, and pulling more than 20 pounds; and no bending and twisting the spine (Ex. 5F at 42). These opinions are generally supported by the providers' records, which reflect the claimant underwent elective L4-5 lateral lumbar interbody fusion and posterior minimally invasive screw rod instrumentation

placement on December 14, 2018 (Ex. 6F at 5). Therefore, these acute restrictions appear to be prior to or related to the claimant's surgery. However, these opinions are inconsistent with later evidence discussed above, which demonstrates the claimant improved after treatment so much that he is capable of work at the light exertional level. Accordingly, the undersigned does not find these opinions persuasive.

The undersigned also considered the residual functional capacity worksheet completed by Nancy Shedd, M.D. [("Shedd")], the claimant's primary care provider, in November 2019. Dr. Shedd opined the following: the claimant was limited to walking, sitting, and standing for 15 minutes at one time. He can sit five hours, stand two hours, and walk one hour in an eight-hour day, with 5 to 10- minute breaks to stand/walk in between periods of sitting. He is able to lift and carry 10 pounds occasionally. He can never push/pull with his upper extremities and frequently reach. He can never perform postural activities except he can continuously balance. He can never tolerate exposure to unprotected heights or vibrations. He can occasionally tolerate exposure to operating a motor vehicle and extreme cold; and requires a quiet work environment. Significantly, she noted that on a "bad day" the claimant would be off task 20-25% (Ex. 3F). Dr. Shedd offered the same opinion on the claimant's functioning in a report dated December 29, 2022 (Ex. 20F). Dr. Shedd's opinion[s] are not supported by her treatment notes, which do not demonstrate such findings or treatment that would limit the claimant to such significant restrictions (Exs. 4F, 23F). Moreover, [they are] inconsistent with the other evidence discussed above, which demonstrates that the claimant has had limited treatment after his elective surgeries and has improved to the point that he is capable of working. Therefore, the undersigned [finds] Dr. Shedd's opinions not persuasive.

Consultative examiner Dr. Toor opined that the claimant would have a moderate limitation in standing, walking, sitting, bending, lifting, or carrying. The undersigned finds Dr. Toor's opinion persuasive to the extent that it is supported by his examination, which indicated some positive findings (Ex. 10F), and consistent with the other evidence discussed above, which demonstrates the claimant is limited to a reduced range of light work. However, the residual functional capacity was not provided in occupationally relevant terms, which limits the usefulness of his opinion.

Lastly, the undersigned finds [the consultative opinion of Arnold Ostrow, M.D. ("Ostrow")] generally persuasive. At the hearing, Dr. Ostrow [appeared and testified]] that the claimant is limited to lift 20 pounds occasionally, 10 pounds frequently; sit/stand/walk for 6 hours in an 8-hour workday; occasionally operate foot pedals; occasionally perform postural activities except never balance or climb ladders, ropes, or scaffolds; and must avoid unprotected heights (Hearing Testimony).[7] Dr. Ostrow's opinion is based upon an examination of the claimant's entire record and is consistent with the overall objective evidence discussed above. Dr. [Ostrow] also cited to the record to support his opinion, and is familiar with Social Security rules, regulations, and listings,

In sum, the claimant alleges that his medically determinable impairments preclude him from sustaining regular and continuous work. However, the nature, scope, and findings from his longitudinal treatment records are not supportive of the intensity or persistence of his subjective allegations. As discussed in the foregoing, the medical evidence reflects that besides his elective surgeries, the claimant's treatment has been generally limited and conservative. When considered as a whole, the evidence reasonably supports a finding that the claimant is limited by his impairments, but those limitations, as well as his subjective complaints, are adequately accommodated by the assigned residual functional capacity of light work; occasional push/pull bilaterally; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; no balancing; occasional stooping, kneeling, crouching, and crawling; avoid concentrated exposure to vibrations; no hazards such as unprotected heights and dangerous machinery; occasional operation of a motor vehicle; and occasional exposure to atmospheric conditions as
defined by the SCO.

---

[7] *See*, Plaintiff's Memo of Law, ECF No. 6-1 at p. 6 ("Dr. Arnold Ostrow appeared and testified at Plaintiff's July 6, 2023 hearing. (Tr. 737-754). He found Plaintiff to have the impairments of lumbosacral dis degenerative disease and status post repair of bilateral inguinal hernia. (Tr. 738). He opined that Plaintiff could lift twenty ponds occasionally; ten pounds frequently; stand and walk for six hours in an eight hour day; sit for six hours in an eight hour day; occasionally use foot pedals bilaterally; and he could perform occasional postural. (Tr. 740). Dr. Ostrow testified that pain was subjective, and complaints of pain by the individual "are subjective and outside my capability to comment on." (Tr. 742).").

Tr. 715-719 (emphasis added).

The ALJ then found that with the RFC described earlier, Plaintiff could perform his past relevant work, and, alternatively, that he could also perform other work, and was therefore not disabled. Tr. 719-721.   Plaintiff appealed, but the Appeals Council declined to review the ALJ's decision, thereby making the ALJ's decision the Commissioner's final decision.

In this action, Plaintiff maintains that the Commissioner's decision contains "multiple errors" of law and is unsupported by substantial evidence, all related to the ALJ's RFC finding. ECF No. 6-1 at p. 9.   In general, Plaintiff maintains that contrary to what the ALJ found, the record indicates his pain and functional limitations did not improve following his spinal surgery, and that the ALJ arrived at his RFC finding by mischaracterizing the evidence.

More specifically, Plaintiff contends that the Commissioner's decision must be reversed for the following reasons: 1) the ALJ erred in finding that Ostrow's opinion was "generally persuasive" and "consistent with the overall objective evidence," since the ALJ engaged in impermissible "cherry picking" of evidence by failing to discuss that Ostrow's opinion did not account for Plaintiff's subjective pain; 2) the ALJ further erred in relying on Ostrow's opinion, since it was based in part on speculation by Ostrow that the limitations imposed by Plaintiff's spinal surgeon, Yan, would only remain in place for three months after surgery; 3) the ALJ also erred in relying on Ostrow's opinion, since Ostrow incorrectly assumed that Plaintiff's condition improved after his back surgery, when in fact there was no evidence of improvement; 4) the ALJ erred by citing Plaintiff's pursuit of only

conservative treatment following his surgery as evidence that the surgery had been successful, since no other treatment had been offered to him; 5) the ALJ erred in "focusing" on Plaintiff's return to part-time work as evidence of improvement, since his ability to do such work was not necessarily indicative of improvement or of an ability to perform light work on a sustained basis; and 6) the ALJ failed to properly evaluate the supportability and consistency of Toor's opinion, since the ALJ made his consistency finding by comparing Toor's opinion to an already-determined RFC finding, rather than comparing it to the other medical evidence.

The Commissioner disagrees and contends that his decision is free of legal error and supported by substantial evidence, including "Plaintiff's largely unremarkable physical examinations, benign medical imaging, conservative treatment, reported activities, and opinion evidence." ECF No. 15-1 at p. 5.

The Court has carefully considered the parties' submissions, including Plaintiff's reply brief, ECF No. 16.

DISCUSSION

Plaintiff primarily contends that the ALJ committed multiple errors when evaluating the medical opinion evidence, including by "cherry picking" information from Ostrow's hearing testimony.   The basic legal principles governing an ALJ's duty to evaluate the persuasiveness of medical opinions are clear:

> The two "most important factors" for determining the persuasiveness of medical opinions are consistency and supportability, and an ALJ is required to "explain how [he] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. § 416.920c(b)(2)[;20 C.F.R. §

15

404.1520c(b)(2)].[8]

With regard to "supportability," the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1) )[;20 C.F.R. § 404.1520c(c)(1)]. The regulations provide that with regard to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. 416.920c(c)(2)[;20 C.F.R. § 404.1520c(c)(2)].

***

An ALJ's failure to explain the supportability and consistency of the medical opinions in the record constitutes procedural error. *See Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019); *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, *2 (2d Cir. June 17, 2022) (summary order) (finding that "the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record"). [9] However, "if 'a searching review of the record' assures [the court] 'that the substance of the [regulation] was not traversed,'" the court may affirm the Commissioner's decision. *Loucks*, 2022 WL 2189293, at *2 (quoting *Estrella*, 925 F.3d at 96 (*quoting Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004))).

*Jason A. L. v. Comm'r of Soc. Sec.*, No. 521CV477FJSTWD, 2022 WL 4354363, at *2

(N.D.N.Y. Sept. 20, 2022).

---

[8] *See, Porteus v. O'Malley*, No. 23-969, 2024 WL 2180203, at *1 (2d Cir. May 15, 2024). ("The ALJ was only required to consider the submitted medical opinions based on the five factors set forth in the regulations and to explain how the two "most important" factors – supportability and consistency – applied to each opinion. See 20 C.F.R. § 404.1520c(b)(2) ("[ALJs] may, but are not required to, explain how [they] considered the [other] factors[.]").

[9] The Second Circuit has indicated that an ALJ should provide some degree of explanation on these points beyond merely indicating, for example, that he or she finds that an opinion is, or is not, well supported or consistent with the record. *See, Loucks v. Kijakazi*, 2022 WL 2189293 at *2 ("Here, the ALJ committed procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record.  . . .   [T]he ALJ did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was.") (emphasis added).

Additionally, where an ALJ makes an RFC finding that conflicts with a medical opinion, the ALJ must explain why the conflicting opinion was not adopted, and in doing so the ALJ cannot ignore or mischaracterize evidence. *See*, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 1, 1996) ("The RFC assessment must always consider and address medical source opinions. *If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (emphasis added).

> Generally, an ALJ must reconcile discrepancies between his or her RFC assessment and medical source statements. SSR 96-8p, 1996 WL 374184, at *7; *see Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006). "If the ALJ's RFC finding conflicts with an opinion from a medical source, the ALJ 'must explain why the opinion was not adopted.'" *Williams v. Colvin*, No. 13-rcnv-5431 (RLE), 2015 WL 1223789, at *8 (S.D.N.Y. Mar. 17, 2015) (quoting SSR 96-8p); *accord Garcia v. Berryhill*, No. 17-cv-10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018). While an "ALJ is not required to explicitly reconcile every conflicting shred of evidence in the record, an ALJ cannot simply selectively choose evidence in the record that supports [his] conclusions." *Williams*, 2015 WL 1223789, at *8 (cleaned up); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (an ALJ may not "arbitrarily substitute his own judgment for competent medical opinion").

*Lynch v. Commissioner*, No. 22CIV5620CSAEK, 2024 WL 728483, at *11 (S.D.N.Y. Feb. 21, 2024); *see also, Blash v. Comm'r of Soc. Sec. Admin.*, 813 F. App'x 642, 644 (2d Cir. 2020) ("The ALJ is obligated to consider "'all of the relevant medical and other evidence.'" *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1545(a)(3)). An ALJ's failure to consider relevant evidence is grounds for remand. *See id.*; *see also Kohler v. Astrue*, 546 F.3d 260, 268-69 (2d Cir. 2008) (concluding that ALJ erred by

17

tending to "overlook or mischaracterize" portions of evidence that supported disability finding)."); *Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).[10]

In this regard, it is, of course, clear that an ALJ is not permitted to "cherry pick" evidence that supports his RFC finding while ignoring contrary evidence. *See, Bohart v. Astrue*, No. 10-CV-6503, 2011 WL 2516413, at *5 (W.D.N.Y. June 23, 2011) ("An ALJ cannot selectively choose the only portions of a medical opinion that support his determination, while ignoring others.") (citations omitted).

> Cherry-picking can be defined as "inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source." *Artinian v. Berryhill*, No. 16-cv-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018). Cherry-picking can "indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both." *Id.* (quoting *Younes v. Colvin*, No. 1:14-cv-170, 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015)). But an allegation of cherry-picking is "seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014). Indeed, what a claimant may label as cherry-picking can often be described "more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009).

---

[10] *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimalizing Dr. Dron's opinion.").

*Lisa T. v. Kijakazi*, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *3 (D. Conn. June 21, 2022).[11]   Certainly, however, remand may be appropriate where a plaintiff demonstrates that an ALJ engaged in cherry picking or otherwise mischaracterized evidence. *See, Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary."); *Vanessa N. v. Comm'r of Soc. Sec.*, No. 1:23-CV-00913 EAW, 2024 WL 4131242, at *3 (W.D.N.Y. Sept. 9, 2024) ("Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.").

With these general principles in mind, the Court will address Plaintiff's particular arguments.

## The ALJ Did Not Mischaracterize Ostrow's Opinion

Plaintiff asserts that the ALJ committed error by finding that Ostrow's consultative opinion was "generally persuasive," purportedly, since the ALJ engaged in a "selective reading" of the opinion, and since the opinion itself was so flawed that it could not constitute substantial evidence. *See, e.g.*, Plaintiff's Memo of Law, ECF No. 6-1 at p. 11

---

[11]  *See also, Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019) (Observing that some impairments, such as depression, may have symptoms that wax and wane, and that, "in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014); *see also Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.... Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). When viewed alongside the evidence of the apparently cyclical nature of Estrella's depression, the ALJ's two cherry-picked treatment notes do not provide 'good reasons' for minimizing Dr. Dron's opinion.").

("[T]he ALJ found this opinion "generally persuasive" [and] "consistent with the overall objective evidence" discussed. (Tr. 719). However, this is a selective reading of Dr. Ostrow's testimony—which cannot constitute substantial evidence."); *see also, id*. at p. 12 ("Dr. Ostrow's opinion affirmatively does not encompass Plaintiff's pain--- [and] thus should not have been found persuasive."); *id*. ("[O]ther findings from Dr. Ostrow are based on his personal speculation—which also cannot constitute substantial evidence.").

However, the Court disagrees.  First, the Court finds no merit to Plaintiff's assertion that the ALJ "cherry picked" Ostrow's opinion by failing to mention that it did not account for Plaintiff's subjective pain.   Ostrow provided a consultative opinion based on his review of Plaintiff's medical records, and expressly stated that he was basing such opinion on the objective medical findings.   Indeed, Ostrow repeatedly acknowledged that he did not have the ability to evaluate Plaintiff's pain.   Ostrow essentially provided an opinion as Plaintiff's functional abilities, based on the objective medical findings.

When discussing Ostrow's opinion, the ALJ, who was aware both that Ostrow had not personally examined Plaintiff and that Ostrow's assessment did not take pain into account,[12] never implied that Ostrow's testimony refuted Plaintiff's subjective complaints of pain.   Rather, the ALJ stated, "Dr. Ostrow's opinion is based upon an examination of the claimant's entire record and is consistent with the overall *objective evidence* discussed above." (emphasis added).

To be sure, the ALJ found that Plaintiff's subjective complaints of pain were not

---

[12] *See*, Hearing Transcript at p. 750 ("[Dr. Ostrow]: "I hope both you and the attorney appreciate, objectively, pain is outside my capability to evaluate.   ALJ:   Right.   Understood.").

entirely credible or consistent with the evidence, but he did not cite just Ostrow's testimony as support for such finding.   Rather, when assessing the credibility of Plaintiff's subjective complaints of pain, the ALJ, as set forth in his explanation above, relied on the overall record, which, he found, showed the following: That after Plaintiff's back surgery, he reported that much of his pain had resolved; that Plaintiff was eventually able to return to work full-time, though he was later terminated for failing to follow "company rules"; that on the day Plaintiff asked his doctor to fill out disability forms, the doctor's examination found "no abnormalities"; that in contrast to Plaintiff's complaints of disabling pain, treatment notes "more frequently noted the claimant as being in no acute distress with a normal gait and ambulation, normal strength, and unremarkable findings on range of motion testing"; and that Plaintiff gave inconsistent, apparently exaggerated, statements to consultative examiners about the extent of his pain and his activities of daily living.

Based on his consideration of all such evidence, the ALJ concluded that the overall record was "not supportive of the intensity or persistence of [Plaintiff's] subjective allegations" of total disability, and that, rather, "[w]hen considered as a whole, the evidence reasonably supports a finding that the claimant is limited by his impairments, but those limitations, as well as his subjective complaints, are adequately accommodated by the assigned residual functional capacity of light work." Tr. 719.

In this regard, the ALJ appears to have properly followed the Commissioner's regulations, and in particular, 20 C.F.R. § 404.1529(c), which states in pertinent part:

> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about

21

how your symptoms affect you. We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

***

In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence from your medical sources and nonmedical sources about how your symptoms affect you. We also consider the medical opinions as explained in § 404.1520c.

***

Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption. Objective medical evidence of this type is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. The information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account as explained in paragraph (c)(4) of this

22

section in reaching a conclusion as to whether you are disabled. We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons. Section 404.1520c explains in detail how we consider medical opinions and prior administrative medical findings about the nature and severity of your impairment(s) and any related symptoms, such as pain. Factors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(1), (3) (Westlaw 2025).

Again, it appears that the ALJ properly followed this rule, and Plaintiff has not shown otherwise.   Rather, Plaintiff suggests that the ALJ should not have relied on Ostrow's medical opinion, since it did not "account" for Plaintiff's subjective complaints of pain.   However, the Court finds this argument puzzling, since it is not aware of any disability rule requiring a non-examining medical consultant to incorporate a claimant's subjective complaints of pain into his opinion.   Indeed, as referenced earlier, the relevant regulation recognizes that "symptoms, such as pain, are subjective and difficult to quantify," which is why, when claimant's alleged symptoms "suggest a greater severity of impairment than can be shown by objective medical evidence alone," ALJs are required not to rely just on objective evidence, but to also consider other factors, including those

listed in 20 C.F.R. § 404.1529(c)(3), which the ALJ did here.

For these various reasons, the Court finds no merit to Plaintiff's assertions, that the ALJ "cherry picked" evidence from Ostrow's opinion, and that Ostrow's opinion "should not have been found persuasive" because it did "not encompass Plaintiff's pain."

Plaintiff nevertheless contends that the ALJ also erred in finding Ostrow's opinion persuasive, purportedly, since the opinion was unsupported, insofar as it was based on two incorrect assumptions:  First, that the functional restrictions given by Yan and Childers were temporary, and intended to remain in effect for only approximately three months after Plaintiff's spinal surgery; and, second, that Plaintiff's functional abilities improved following such surgery.   According to Plaintiff, these incorrect assumptions by Ostrow essentially rendered his opinion worthless, or, at least, unable to constitute substantial evidence.[13]

Regarding these arguments, the Court observes, for purposes of background, that Ostrow testified he based his opinions on his review of the "objective medical records, complemented by [his] education, training, and experience." Tr. 740.   Additionally, concerning the restrictions given by Yan (and his PA, Childers), and whether Plaintiff improved following his surgery, Ostrow testified, in pertinent part, that it was his opinion

---

[13] *See*, Plaintiff's Memo of Law, ECF No. 6-1 at p. 12 ("Importantly, other findings from Dr. Ostrow are based on his personal speculation—which also cannot constitute substantial evidence.   Concerning opinions offered by Dr. Li and PA Childers, Dr. Ostrow said these opinions would apply for about three months after surgery[.]   . . .   But Dr. Ostrow does not point to evidence in the record to support that. This is total speculation on Dr. Ostrow's part because he did not offer those opinions and was not a part of Plaintiff's actual treatment."); *see also, id*. at 13 ("It should also be noted that there is no real evidence that showed Plaintiff improved significantly since his surgery. [The evidence concerning Plaintiff's condition post-surgery] hardly constitutes the kind of improvement that Dr. Ostrow and the ALJ assumed in the determination.").

that such restrictions were only temporary post-surgical restrictions, and that Plaintiff's functional abilities improved after surgery:

> For about three months after [the surgery date,] those criteria [stated by Dr. Yan] would apply.   But the physician doesn't think that they should be applicable forever.  . . .  I appreciate what the examining physician said regarding [the claimant having] surgery.  He did the surgery.  He was restricted, I would assume, for a three-month period of time to recover. And by the date that he could safely  -- I think my residual functional capacity would be appropriate.

Tr. 746.   On this point, Ostrow indicated that, although Yan's statements had not specified how long he had intended the functional restrictions to remain in place, it would be unusual for such restrictions to remain in place longer than three months after surgery:

> Attorney: My client was injured, and then he had surgery in 2018.   Was there at least an acute period of disability following the surgery?

> Ostrow: Well, by acute, I'm not sure what you mean, but I think approximately three months following the surgery would be a period of time where recovery would be gradual.   And beyond three months, it would be somewhat unusual.

> Attorney: Is that indicated in the medial record before you?

> Ostrow: No.

Tr. 753.

Having considered the parties' arguments and the relevant portions of the record, the Court finds no merit to Plaintiff's contention that Ostrow's testimony was based on improper speculation.   First, as to the duration of the restrictions imposed by Yan and Childers, Plaintiff is seizing upon the line of Ostrow's testimony in which he stated, "I would assume."   However, Plaintiff has not demonstrated that Yan and Childers intended

25

the subject restrictions to be permanent, and consequently, even if Ostrow had been only assuming that the restrictions were temporary, Plaintiff has not shown that the assumption was incorrect. However, more importantly, it appears that Ostrow's opinion about the duration of those restrictions was based on his training and experience as a physician, and not on unsupported speculation. In that regard, Ostrow expressly indicated that his testimony was based on "objective medical records, complemented by [his] education, training, and experience." Tr. 740. Since Ostrow acknowledged that the medical records did not expressly state the duration of the restrictions, the reasonable inference is that he was basing his opinion, that the restrictions were temporary, on his education, training, and experience.[14] Indeed, Ostrow's statement, that it "would be somewhat unusual" for such limitations to last more than three months after surgery, indicates that it was based on his training and/or experience as a physician. *See, e.g.*, Tr. 753 ("I think approximately three months following the surgery would be a period of time where recovery would be gradual. And beyond three months, it would be somewhat unusual.").

In any event, Plaintiff has not shown that any error in this regard was harmful. The ALJ did not just accept that Plaintiff's condition automatically improved after three months, based on Ostrow's testimony, as Plaintiff seems to imply. Rather, the ALJ found that Plaintiff's condition improved after surgery based on the medical treatment notes, which documented such improvement:

---

[14] *Compare, Robbins v. Colvin*, No. 514CV1534MADCFH, 2016 WL 11477509, at *14 (N.D.N.Y. Mar. 3, 2016) ("The ALJ's assumption that the limitations set forth in Dr. Wulff's assessment were of limited duration was improper, as it is well-established that an ALJ may not substitute his or her own judgment in place of a competent medical opinion."), report and recommendation adopted, No. 5:14-CV-1534, 2016 WL 1118450 (N.D.N.Y. Mar. 22, 2016).

These opinions [by Yan and Childers] are generally supported by the providers' records, which reflect the claimant underwent elective L4-5 lateral lumbar interbody fusion and posterior minimally invasive screw rod instrumentation placement on December 14, 2018 (Ex. 6F at 5). Therefore, these acute restrictions appear to be prior to or related to the claimant's surgery. However, these opinions are inconsistent with later evidence discussed above, which demonstrates the claimant improved after treatment so much that he is capable of work at the light exertional level.

ALJ's Decision, Tr. 718; *see also*, Tr. 716 ("Post-surgical follow-up records reflect resolution of the claimant's leg pain, as well as improved left thigh numbness and buttock pain. By March 2019, the claimant reported his buttock pain resolved, ambulation improved, and only has low back pain when bending.") (citations to record omitted); *id.* ("Physical exams by providers in 2020 note only some slightly reduced range of motion of the lumbar spine with flexion and extension as well as tenderness around the scars at the surgical site. Examinations more frequently noted the claimant as being in no acute distress with a normal gait and ambulation, normal strength, and unremarkable findings on range of motion testing.") (citations to record omitted); *id.* at 718 ("[T]hese opinions [from Yan and Childers] are inconsistent with later evidence discussed above, which demonstrate the claimant after treatment so much that he is capable of work at the light exertional level."). Consequently, even assuming *arguendo* that Yan and Childers had intended their restrictions to remain in place permanently, the ALJ reasonably found, based on other evidence, that, following surgery, Plaintiff's abilities improved and exceeded those limitations.

Nor does the Court find merit to Plaintiff's related argument, that the ALJ erred in finding Ostrow's opinion persuasive since the opinion incorrectly assumed that Plaintiff's

27

functional abilities improved following his spinal surgery.    In this regard, the Court notes, preliminarily, that the premise of Plaintiff's argument is faulty, since there is no indication in the record that Ostrow made such an assumption.    Rather, Ostrow indicated that his opinion about Plaintiff's post-surgical functional limitations was based on his review of the objective medical record.

Moreover, for reasons already discussed, it is evident that the ALJ did not base his RFC finding on any such alleged assumption by Ostrow, but, rather, he based it on the medical treatment notes that documented Plaintiff's post-surgical improvement. Furthermore, the issue of whether Plaintiff's condition improved after surgery is a question of fact resolved by the Commissioner, which finding this Court could only overturn if it determined that no reasonable factfinder could have reached the same conclusion as the ALJ did. *See, Schillo v. Kijakazi*, 31 F.4th at 69 ("We may vacate the agency's disability determination only if . . . no reasonable factfinder could have reached the same conclusion as the ALJ.").    Plaintiff has not shown that this finding is unsupported by substantial evidence; rather his argument amounts to a mere disagreement with how the ALJ weighed the evidence, which is not a basis for reversal.

<u>The ALJ Appropriately Considered Plaintiff's
Limited and Conservative Treatment</u>

Plaintiff next contends that the ALJ erred, when evaluating the medical opinion evidence and making his RFC finding, by finding that Plaintiff's "limited and conservative" medical treatment following his spinal surgery [15] showed that Plaintiff had greater

---

[15] As set forth earlier, the ALJ stated: "Treatment for the claimant's back impairment was conservative in

functional ability than was opined to by Yan, Childers, and/or Shedd.   In particular, Plaintiff maintains that the ALJ violated SSR 18-3p by referencing Plaintiff's limited treatment:

> ALJ's may only draw negative inferences from a lack of treatment if a claimant "fails, without good cause, to follow prescribed treatment that we expect would restore his or her ability to engage in substantial gainful activity." SSR 18-3p. As noted above, Dr. Koh listed the treatment modalities that Plaintiff had tried—but all without adequate pain relief. (Tr. 669). When Plaintiff had the next level of treatment recommended—trigger point injections—the relief lasted only a week. (Tr. 997; 49-50). Plaintiff also had a history of opiate addiction, for which he was prescribed suboxone. So logically, stronger pain medication was not a viable option for him. It does not appear that there was any more treatment recommended by his team that would restore his ability to work in the national economy—thus the lack of treatment should not have been used against him in the decision.

ECF No. 6-1 at pp. 13-14.[16]

The Commissioner responds that the ALJ's consideration of Plaintiff's

---

2020. The record notes he was treated with Flexeril and Motrin. He was provided a back brace and bone stimulator was ordered, but there is no evidence of its use or efficacy. He was also treated with a trigger point injection in October 2020 (Exs. 18F at 20; 19F at 25, 28). . . . Records from 2021 and 2022 reflect very limited treatment. In January 2021, the claimant reported pain very focal around two incisions in his back. Otherwise, his surgery took away a lot of the "burning" pain in his low back, but he has chronic numbness in his left leg. An examination revealed tenderness to palpation to lumbar paravertebral muscles. Again, it was noted that most of his pain seems "superficial" around his vertical lumbar scars. It was decided that he undergo another trigger point injection since after his October 2020 injection, he was able to stand and walk for longer periods. He underwent such injection in March 2021 (Ex. 21F at 1). . . . [T]he other evidence discussed above . . . demonstrates that the claimant has had limited treatment after his elective surgeries andhas improved to the point that he is capable of working. . . . [T]he medical evidence reflects that besides his elective surgeries, the claimant's treatment has been generally limited and conservative." Tr. 715-719.

[16]  Some courts have found it error for an ALJ to characterize a claimant's treatment as "conservative" without a supporting medical opinion to that effect.   *See, e.g., Astuto v. Colvin*, No. 16-CV-1870 (PKC), 2017 WL 4326508, at *8 (E.D.N.Y. Sept. 28, 2017) ("[T]he Court finds that the ALJ erred in characterizing Plaintiff's treatment regime as "conservative" without further developing the record and, if necessary, obtaining a medical expert's opinion as to what other treatment would have been given or prescribed to Plaintiff if her pain levels were higher.") Here, though, Plaintiff does not dispute that his treatment actually was "conservative," and, in any event, Yan referred to the treatments, other than surgery, as such. *See, e.g.*, Tr. 341.

conservative treatment was proper and in accordance with the regulations:

> Plaintiff's conservative treatment related to his back supports the RFC finding for light work. Specifically, the ALJ considered that Plaintiff's back pain during the relevant period was treated with Flexeril (a muscle relaxer), Motrin, and trigger point injections. Tr. 716-17 citing Tr. 641, 686-87, 994, 997. The ALJ also observed that although Plaintiff was prescribed a back brace and bone stimulator, there was no evidence of their use or efficacy. Tr. 716-17 citing Tr. 651. Further, the ALJ considered that records from 2021 and 2022 showed very limited treatment. Tr. 717. The ALJ's consideration of Plaintiff's conservative treatment for his pain in formulating the RFC was proper. *See* 20 C.F.R. § 416.929(c)(3)(iv)-(v) (in evaluating the intensity and persistence of symptoms, such as pain, and determining the extent to which symptoms limit the capacity for work, ALJs may consider medication taken to alleviate pain or other symptoms and any treatment, other than medication, received for relief of pain or other symptoms); *see also Katherine R.,* 2021 WL 5596416, at *6 (finding "records showing plaintiff's relatively conservative treatment" constitute substantial evidence for the ALJ's RFC for light work).

ECF No. 15-1 at pp. 8-9.

The Court again disagrees with Plaintiff and agrees with the Commissioner. Plaintiff cites Social Security Ruling 18-3p, "Failure to Follow Prescribed Treatment," for the proposition that "ALJ's may only draw negative inferences from a lack of treatment if a claimant 'fails, without good cause, to follow prescribed treatment that we expect would restore his or her ability to engage in substantial gainful activity."   Plaintiff maintains that the ALJ violated this rule, since Plaintiff had already tried various recommended "treatment modalities," including "trigger point injections," "without adequate pain relief," and since Plaintiff had "a history of opiate addiction for which he was prescribed suboxone," which "logically [meant that] stronger pain medication was not a viable option for him." ECF No. 6-1 at p. 13.

However, Plaintiff's reliance on SSR 18-3p is misplaced, since a finding that a claimant had only limited and conservative treatment, such as occurred here, is not the same as a finding that a claimant failed to follow a prescribed treatment.  An ALJ may properly consider both things,[17] but SSR 18-3p only applies to the latter situation. Furthermore, SSR 18-3p only applies where a claimant would be found disabled but for his failure to follow a prescribed treatment for the impairment upon which the disability finding is based,[18] which is also not the case here.

Having determined that SSR 18-3p does not apply, it is further clear that, in general, a claimant's pursuit of only conservative treatment is a factor that an ALJ may properly consider when making an RFC finding. *See, Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) ("Our independent review of the administrative record supports the ALJ's credibility determination. For example, while Penfield testified that her constant pain prevented her from standing for more than five minutes without leaning against something or dressing herself without assistance, her treating physician consistently prescribed a

---

[17] *See, e.g., Wilwant v. Astrue*, No. ED CV 07-718-SH, 2008 WL 2620382, at *5 (C.D. Cal. July 1, 2008) ("One factor that may be considered regarding the credibility of plaintiff's alleged disability is the type and extent of treatment plaintiff had in relation to the alleged disability.   Minimal, conservative treatment would indicate that the condition is not as severe as plaintiff claims.   Similarly, plaintiff's failure to follow a prescribed treatment or seek rehabilitation or treatment would also indicate that plaintiff's condition is not severe.") (citations omitted).

[18] *See*, Soc. Sec. Ruling, Ssr 18-3p; Titles II & Xvi: Failure to Follow Prescribed Treatment, SSR 18-3P (S.S.A. Oct. 2, 2018) ("We will determine whether an individual has failed to follow prescribed treatment only if all three of the following conditions exist: 1. The individual would otherwise be entitled to benefits based on disability or eligible for blindness benefits under titles II or XVI of the Act; 2. We have evidence that an individual's own medical source(s) prescribed treatment for the medically determinable impairment(s) upon which the disability finding is based; and 3. We have evidence that the individual did not follow the prescribed treatment. If all three conditions exist, we will determine whether the individual failed to follow prescribed treatment, as explained below.") (footnote omitted).

"conservative treatment" regimen that consisted of "walking[,] home exercise program[s],"

and "gentle stretching."); *see also*, *Abarzua v. Berryhill*, 754 F. App'x 70, 71 (2d Cir. 2019)

("Here, the ALJ did not err in observing that Dr. Khasidy's opinion that Abarzua could not

lift ten pounds or sit continuously in a work setting was contradicted by substantial medical

evidence, as well as Abarzua's activities of daily living.   Such medical evidence includes

the examination and opinions of Dr. Brahms and Dr. Lathan as well as Abarzua's

conservative treatment.").   Consequently, the Court finds no merit to Plaintiff's argument

that the ALJ erred by considering his limited and conservative treatment.[19]

> The ALJ Properly Considered Plaintiff's
> Performance of Part-Time Work

Plaintiff next contends that the ALJ erred by citing Plaintiff's return to part-time

work as evidence that he had greater functional ability than was opined to by Yan,

Childers, and/or Shedd.   Plaintiff maintains that this was error, since such work was

performed at an exertional level below the light exertional level found in the RFC:

> It is also important to note that Plaintiff's ultimate return to SGA work was
> not at the light level. He took the job because he knew that the job was
> performed mainly sitting down, with just ten to fifteen minutes of walking an
> hour. (Tr. 760-761). The ALJ's focus on this job as evidence of supposed
> improvement was thereby misplaced.

ECF No. 6-1 at p. 14

Regarding this argument, the Court observes, for purposes of background, that at

the administrative hearing conducted on July 6, 2023, Plaintiff acknowledged that he was

---

[19]  As part of this determination, the Court finds no merit to Plaintiff's speculative and unsupported
assertion that his doctors may have avoided prescribing him stronger pain medications since he was in
sustained remission from an opioid addiction.

then working, and had been since July 2022, at the SGA level, as a "security guard" at a

tavern.    Tr. 734-735, 755-756.    Plaintiff's counsel asserted that such work was

"performed at a sedentary exertional level." Tr. 734-735.    Plaintiff testified that the actual

work primarily involved sitting and watching customers: "I sit down at the establishment,

and I just watch people as they come in and out." Tr. 755.    Plaintiff further indicated that

he checked customer's identification at times, and, when necessary, called other security

guards to address problems or break up fights. *See*, Tr. 756-757 ("Q. So you're just there

to – are you checking IDs?   Is that what you're doing?   A. I do that.   And basically, if

something was to happen in our spot, I call security.   It's next door.   And they come

over.   Q. Okay.   Got it.   So you're not, like, breaking up fights or anything like that or

anything else that --   A. No.   No."); *see also*, Tr. 759 (Plaintiff indicated that the job

"basically" involved "sitting," with the option to stand when necessary: "I knew from

somebody that works there, that it was a job that, basically, [involves] sitting right down .

. . [a]nd if I get sore, I can easily just stand for a moment.").    Plaintiff further stated that

the job required no lifting, and required him to walk about the restaurant "around once an

hour," for approximately fifteen minutes per hour, "[j]ust [to take] a quick look around,

basically, a quick look around to make sure there's not people arguing or whatever." Tr.

761.

        In the ALJ's decision, he made a few brief references to this evidence.    First, when

considering whether Plaintiff had engaged in substantial gainful activity, the ALJ stated:

"With respect to the third quarter of 2022, the claimant testified that he started working

again in June 2022 at a restaurant/brewery checking IDs.   He works part-time (24 hours

per week, 4-5 days per week, for $17.17 an hour).” Tr. 712.    Later, the ALJ essentially

repeated this same observation when discussing Plaintiff's daily activities, as part of his

RFC discussion. *See*, Tr. 716 (“He started working again in June 2022 at a

restaurant/brewery checking IDs.   He works part-time (24 hours per week, 4-5 days per

week, for $17.17 an hour).”).    Otherwise, though, the ALJ did not discuss Plaintiff's work

checking IDs.[20]

Nevertheless, Plaintiff contends that the ALJ improperly “focused” on this work, as

evidence of Plaintiff's post-surgical improvement, when making his RFC finding:

> It is also important to note that Plaintiff's ultimate return to SGA work was
> not at the light level.   He took the job because he knew that the job was
> performed mainly sitting down, with just ten to fifteen minutes of walking an
> hour. (Tr. 760-761).   The ALJ's focus on this job as evidence of supposed
> improvement was thereby misplaced.

ECF No. 6-1 at p 14.

However, the Court cannot agree that the ALJ placed any great “focus” on this

evidence, or that he cited this work as evidence of Plaintiff's post-surgical improvement.

Rather, at most, the ALJ indicated, at the first step of the sequential evaluation, when

discussing the fact that Plaintiff was then engaging in SGA, that he would consider such

work later in his decision, as “some evidence” of Plaintiff's functional capacity:

> With respect to the third quarter of 2022, the claimant testified that he
> started working again in June 2022 at a restaurant/brewery checking IDs.
> He works part-time (24 hours per week, 4-5 days per week, for $17.17 an
> hour).

---

[20] At step four of the sequential evaluation, the ALJ discussed Plaintiff's past work, working as a bouncer
in bars between 2013 and 2015. Tr. 762-764.   The VE classified that job as having been performed at
the light exertional level. Tr. 765.   However, that was a different job than the job Plaintiff began
performing in 2022, after his spinal surgery.

> Nevertheless, in the interests of administrative efficiency, the undersigned will proceed through the remainder of the sequential evaluation, as to the entirety of the period at issue (i.e., September 5, 2019 through the date of issuance of this decision), *while considering the claimant's SGA-level work to be some evidence of his residual functional capacity during this period*.

Tr. 712 (emphasis added).   However, as can be seen in the ALJ's RFC finding explanation quoted earlier, the ALJ only mentioned such work when listing Plaintiff's complaints and daily activities, Tr. 716, and did not actually cite it as evidence supporting his RFC finding for light work.   Accordingly, the Court finds that the ALJ either committed no error in this regard, or, if he did, that any such error was harmless in light of the other, more-extensive, evidence upon which he expressly relied when making his RFC finding.

<u>The ALJ Did Not Err in Evaluating the Consistency of Toor's Opinion</u>

Lastly, Plaintiff broadly asserts that the ALJ erred when evaluating both the supportability and consistency of Toor's consultative opinion.   However, since Plaintiff actually only discusses the consistency of Toor's opinion, the Court does not address Plaintiff's undeveloped claim about supportability.

As for the consistency finding, Plaintiff maintains that the ALJ erred by comparing Toor's opinion to an already-determined RFC finding, rather than comparing it to the other evidence of record:

> Plaintiff underwent a consultative evaluation with Dr. Harbinder Toor in March 2020. (Tr. 586). He opined that Plaintiff had moderate limitations standing, walking, sitting, bending, lifting, and carrying. (Tr. 588). The ALJ found this persuasive:
>
>> [T]o the extent that it is supported by his examination…and consistent with the other evidence discussed above, which

35

> demonstrates the claimant is limited to a reduced range of light
> work.
>
> (Tr. 719). This is wholly improper. The question is not how Dr. Toor's opinion
> is consistent with the RFC the ALJ already found, it is whether the opinion
> is supported in and of itself. The consistency factor "measures whether a
> medical opinion is consistent with medical and nonmedical evidence in a
> claim, not whether a medical opinion is consistent with a conclusion that a
> claimant can still work.

ECF No. 6-1 at p. 14 (case citations and internal quotation marks omitted).

However, even assuming that it would have been error for the ALJ to have done what Plaintiff alleges, the Court finds no merit to this argument, since its factual premise is simply incorrect.   That is, Plaintiff asserts that the ALJ found that Toor's opinion was "consistent with the RFC the ALJ already found."   However, that is belied by the ALJ's actual statement, quoted above by Plaintiff, which shows that the ALJ actually stated that Toor's opinion was "supported by his examination…and *consistent with the other evidence* discussed above." (emphasis added).   Admittedly, the ALJ further indicated that both Toor's opinion and the "other evidence" demonstrated that Plaintiff could perform "a reduced range of light work," but that, in addition to being different than what Plaintiff alleged, was not improper.[21]   Accordingly, this aspect of Plaintiff's motion is also denied.

## CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 6) for judgment on the pleadings is denied, Defendant's cross-motion (ECF No. 15) for the same relief is

---

[21]  Because of this, the Court need not address Plaintiff's additional argument about why such alleged error was harmful. *See*, ECF No. 6-1 at p. 15.

granted, and this action is dismissed.   The Clerk of the Court is directed to enter

judgment for Defendant and close this action.

      So Ordered.

Dated: Rochester, New York
      September 29, 2025        ENTER:


                CHARLES J SIRAGUSA
                United States District Judge